Filed 5/23/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ADA ABED,<br><br> Plaintiff and Appellant,<br><br>v.<br><br>WESTERN DENTAL SERVICES, INC.,<br><br> Defendant and Respondent. | A150933<br><br>(Napa County<br>Super. Ct. No. 26-67269) |

This case asks whether a potential employer can be held liable under the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) for thwarting a pregnant woman from applying for a job by falsely telling her that no position is available. In the published portion of our decision, we conclude it can.

Plaintiff Ada Abed sued Western Dental Services, Inc. (Western Dental), alleging two claims, including one for being denied a job on account of pregnancy in violation of the FEHA. Western Dental moved for summary adjudication of the claim, and the trial court ruled in the company's favor on the basis that it was undisputed that Abed had not submitted an application. After resolving the other claim in Western Dental's favor, the court entered a final judgment dismissing the case.

On appeal, Abed contends that the trial court wrongly dismissed her FEHA claim. We agree. Even though Abed never applied for a job, she raised triable issues of material fact as to whether Western Dental intentionally discriminated against her by falsely

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A.

1

telling her that no position was available. Accordingly, we reverse in part and reinstate the FEHA claim.

I.
FACTUAL AND PROCEDURAL
BACKGROUND

A.    *Western Dental's Process for Hiring Dental Assistants.*

Western Dental operates dental offices and clinics throughout California, including one in Napa. The company accepts student externs from schools that have dental assistant programs. Externs who want to be considered for full-time employment as dental assistants are required to submit a written application, undergo a background check, and be interviewed.

When Western Dental posted a job opening for a dental assistant on its website, it did so for one of two reasons. One reason was to advertise actual open positions that needed to be filled. Elvira Quintana was the manager of Western Dental's Napa office, and she testified that she was required to request and obtain the regional manager's approval to fill a need for a dental assistant. If the regional manager approved her request, an open requisition would be created and a solicitation for applications would be posted on Western Dental's website.

The other reason Western Dental would post a job opening was to create a pool of applicants for positions that, while not currently open, might open in the future. According to a manager in Western Dental's corporate recruiting office, who testified as the person most knowledgeable about the company's recruitment of dental assistants, these types of postings were known as "evergreens," and they generated a list of candidates that could be tapped into quickly if a position opened.

In March 2015, an open requisition for a dental assistant in the Napa office was approved, and a solicitation for applications was publicly posted. The recruiting manager testified that she could not tell whether this solicitation, which was on Western Dental's website throughout the relevant time period, was originally posted as an evergreen. Quintana, however, testified that she was not aware of the practice of posting evergreens

2

and did not know of any positions in the Napa office being posted unless they were in fact open.

B. *Abed's Externship at Western Dental.*

Abed began a dental assistant program at Carrington College in July 2014. To obtain her certificate, she was required to complete 180 hours in an unpaid externship with a dental office. The following spring, she successfully applied for an externship in Western Dental's office in Napa, the city where she wanted to live. She began the externship on May 18, 2015. At the time, she was pregnant, which she did not disclose to anyone at Western Dental.

On her first day, Abed met with Dr. Andrew Rivamonte, D.D.S., the managing dentist of the Napa office. According to Abed, Dr. Rivamonte said she should "look at [the externship] as a four- to six-week working interview" and try to learn as much as possible. Dr. Rivamonte testified that he intended to convey to externs "that what they were doing was very, very important, and like the history of all these other externs, that they eventually applied [to] and [were] hired by Western Dental, so [he] wanted to put out there that historically these externs have been hired." Dr. Rivamonte testified that "[a] majority of externs have been hired . . . after their externships," and he could not recall any extern other than Abed who did not obtain a permanent position there.

During her externship, Abed was supervised by Sabrina Strickling, a registered dental assistant. As the floor supervisor, Strickling was responsible for scheduling, ordering supplies, ensuring dentists had assistance and rooms were properly set up, and managing the flow of cases. Strickling sometimes met with job candidates, but "[h]er role in the interview process [was] limited to answering the candidates' questions about the position and explaining office operations." According to Dr. Rivamonte, Strickling "[did] not have the authority to hire, fire, or discipline, nor [did] she make any recommendations related to hiring."

Abed performed several duties as an extern, including taking x-rays, providing chairside assistance, sterilizing instruments, and cleaning exam rooms. Strickling filled out three evaluations of Abed during her externship. Abed consistently received high

marks, and on the final evaluation, Strickling graded her "above average" in all categories.  Dr. Rivamonte characterized Abed as "on par with all the other externs [he] ever had at the office."

> C.    *The Discovery of Abed's Pregnancy.*

At some point during her externship, Abed hung her purse in the employee break room.  The purse was "about halfway" open, and it contained a bottle of prenatal vitamins.  While Strickling was with another employee in the break room, she saw "[t]he vitamins . . . sticking out of the purse."  Strickling asked, "Oh, whose prenatal vitamins are those?," and the other employee indicated the purse was Abed's.  Strickling responded, "Oh, she must be pregnant."

Sometime later, Strickling and a different dental assistant, Mirella DeHaro, were talking in the break room.  DeHaro testified that Strickling said she thought Abed might be pregnant because of the prenatal vitamins in her purse.  Strickling then asked whether DeHaro knew that Abed was pregnant, and DeHaro said no.  DeHaro indicated that Strickling then "said something to the effect that if [Abed] were pregnant, it would not be convenient for the office."  Strickling could not recall the specifics of this conversation, except she confirmed telling DeHaro that she thought Abed was pregnant.

Abed also overheard a conversation about her pregnancy between Strickling and DeHaro.[1]  Abed was standing outside the break room when she "heard [her] name come out of [Strickling's] mouth, and [she] heard pregnant in the same sentence."  Abed heard DeHaro say she did not know whether Abed was pregnant.  According to Abed, Strickling responded, "[W]ell, if she's pregnant, I don't want to hire her."  Abed and DeHaro later exchanged text messages about what Abed had overheard, in which DeHaro apparently confirmed that Strickling had said she did not want to hire Abed because of her pregnancy.  Based on a screenshot of one of these messages, it appears Abed overheard the conversation on May 28, 2015.

---

[1] The parties dispute whether this was the same conversation DeHaro described.

4

D.     *Abed Is Told There Is No Open Position for a Dental Assistant, but Another Extern Is Hired Shortly After Abed's Externship Ends.*

Strickling testified that approximately two weeks after the discovery of Abed's pregnancy, Quintana asked Strickling to tell Abed there were no open positions for a dental assistant in Napa, but that there was one in Vacaville. About a day later, Strickling and Abed met in Quintana's office, and Strickling told Abed what Quintana had said. Quintana, however, could not recall ever telling Strickling to inform Abed that there was no position available in Napa.

According to Abed, a few days before this meeting she had asked Strickling whether there were any openings for dental assistants in the Napa office. Strickling said she was not sure and would check. Strickling confirmed that sometime before she talked to Quintana about Abed, Abed had said she wanted to work in the Napa office, although Strickling could not remember the details of the discussion. Quintana could not recall whether Strickling asked about an opening for Abed.

Abed testified that during the meeting in Quintana's office, Strickling reported there were no openings in Napa but said that "maybe [Abed] would want to check Fairfield or Vacaville." Strickling offered to call to see if those offices were hiring, but Abed did not follow up because she wanted to live in Napa. Abed explained, "My doctor is -- my OB was in Napa. I needed to be local to Napa, which [was] the whole reason [for] doing my externship in Napa."

Abed did not apply for a position in the Napa office because Strickling had told her there were no openings for a dental assistant there. But before her externship was over, Abed learned that an opening in the Napa office was posted on Western Dental's website. When asked why, if she was "told there were no positions available and [she] saw a position posted on the website, . . . [she] didn't . . . go talk to anyone about it," Abed responded, "Why didn't I talk to somebody? Because I'm not the type of person to confront anybody about anything. I [would] much rather just like just chill, just be gone."

5

Abed completed her externship on June 20, 2015. Abed testified, and Strickling agreed, that on Abed's last day Strickling indicated that Abed should contact the Napa office to see if she could get a position there "after she had her baby." As it turned out, Abed never applied for a dental position anywhere. She explained, "I [came] to like the front office more, which is what I do now. So every job I would apply for, it would be the front office. [¶] Although I do have my back knowledge, so I always kind of tell them I can be a floater, from the front to the back, but I want the front."

Meanwhile, on June 4, 2015, a Western Dental recruiter had e-mailed Quintana about two candidates who had applied for a dental assistant position in the Napa office. After clarifying that both candidates should be considered, Quintana replied, "[Okay] thanks girly, I'll call them and get back to you." There is no indication in the record that either of these candidates was contacted, much less hired, by Western Dental. Less than a week after Abed finished her externship, however, the recruiter e-mailed Quintana a placement form for an extern candidate and stated, "I was able to get you an extern [who] is scheduled to start 7/6. Please contact." That candidate became an extern, and in late July, Quintana requested and received approval to extend her an offer to become a dental assistant in the Napa office. Shortly afterward, that candidate was hired for the position created by the open requisition approved the previous March.

E.      *Procedural History.*

Abed filed an administrative complaint against Western Dental with the California Department of Fair Employment and Housing (DFEH), and she received a right-to-sue letter. She filed this lawsuit in September 2015, bringing claims for pregnancy discrimination under the FEHA and invasion of privacy. Western Dental moved for summary judgment, and after granting the motion the trial court entered final judgment for the company in January 2017.[2]

---

[2] Abed does not challenge the dismissal of her claim for invasion of privacy.

6

A. *The Purported Procedural Defects Western Dental Identifies Do Not Defeat Abed's Claim.*

Initially, Western Dental contends that Abed cannot challenge the dismissal of her FEHA claim because she (1) waived her right to appeal and (2) failed to exhaust internal remedies. We are not persuaded on either count.

1. Abed preserved her right to appeal despite not contesting the trial court's tentative ruling.

Western Dental contends that Abed waived her right to challenge the grant of summary judgment because she did not contest the trial court's tentative ruling. It relies on Napa Superior Court Local Rule 2.9, which provides that if a tentative ruling has been posted before a hearing and a party does not give notice of intent to appear at the hearing, "no oral argument will be permitted and the tentative ruling will become the court's ruling." But "[s]ubmission on a tentative ruling is neutral; it conveys neither agreement nor disagreement with the analysis." (*Mundy v. Lenc* (2012) 203 Cal.App.4th 1401, 1406.) Abed opposed the motion for summary judgment, and she was not required to appear to reassert the same arguments she had already made in her memorandum of points and authorities. (See *id.* at pp. 1406-1407.) Her submission to the tentative ruling did not affect her ability to bring this appeal.

2. Abed was not required to pursue Western Dental's internal remedies.

Western Dental also contends that Abed's FEHA claim is barred because Abed failed to report any discrimination to the company and therefore did not exhaust internal remedies. Again, Western Dental is incorrect.

"Employees who believe they have suffered discrimination at the hands of their employers and wish to file civil claims for damages under the FEHA must first exhaust their administrative remedies by filing a complaint with the [DFEH] and obtaining a right-to-sue notice. [Citations.] Employees also may, *but are not required to*, pursue internal administrative remedies offered by their employer." (*Basurto v. Imperial Irrigation Dist.* (2012) 211 Cal.App.4th 866, 879, citing *Schifando v. City of Los Angeles*

(2003) 31 Cal.4th 1074.) The two decisions on which Western Dental relies to argue that Abed was required to exhaust internal remedies are easily distinguishable because they did not involve claims under the FEHA. (*Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, 468-469; *Pepp-Zotter v. Liberty Life Assur. Co.* (N.D.Cal. Sept. 5, 2006, No. C 06-04200 WHA) 2006 U.S. Dist. LEXIS 66445, at *1.) Abed exhausted her administrative remedies by filing a complaint with the DFEH, and nothing more was required to enable her to bring her FEHA claim in the superior court.

      B.     *The Governing Legal Standards.*

            1.     The *McDonnell Douglas* framework.

Under the FEHA, it is unlawful for an employer to engage in adverse employment practices against a person on the basis of "sex" (Gov. Code, § 12940, subds. (a)-(d), (j)), a term defined to include "[p]regnancy or medical conditions related to pregnancy." (*Id.*, § 12926, subd. (r)(1)(A).)[3] Specifically, under section 12940, subdivision (a), the provision on which Abed relies, an employer cannot, based on a person's pregnancy, (1) "refuse to hire or employ the person or . . . refuse to select the person for a training program leading to employment"; (2) "bar or . . . discharge the person from employment or from a training program leading to employment"; or (3) "discriminate against the person in compensation or in terms, conditions, or privileges of employment."[4]

Failure-to-hire claims under the FEHA are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 (*McDonnell Douglas*). (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*); see also *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) The *McDonnell Douglas* framework "reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.

---

      [3] All further statutory references are to the Government Code unless otherwise indicated.

      [4] Because Abed relies exclusively on section 12940, subdivision (a), we do not address whether she might also have a claim under section 12940, subdivision (c), which prohibits pregnancy discrimination "in the selection, termination, training, or other terms or treatment of [a] person" in training programs and other unpaid, limited-term positions.

Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz*, at p. 354.) A plaintiff has the initial burden of producing evidence that establishes a prima facie case of discrimination. (*Ibid.*) Although "[t]he specific elements of a prima facie case may vary depending on the particular facts," the plaintiff in a failure-to-hire case "[g]enerally . . . must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought . . ., (3) he [or she] suffered an adverse employment action, such as . . . denial of an available job, and (4) some other circumstance suggests discriminatory motive," such as that the position remained open and the employer continued to solicit applications for it. (*Guz*, at p. 355; *Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 149.)

If the plaintiff establishes a prima facie case, creating a "presumption of discrimination," the burden shifts to the employer to provide " 'a legitimate, nondiscriminatory reason for the challenged action.' " (*Serri, supra*, 226 Cal.App.4th at pp. 860-861.) Under the third step of the *McDonnell Douglas* framework, "the 'plaintiff must [then] . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive.' " (*Serri*, at p. 861.) The employer's burden to provide a legitimate nondiscriminatory reason is one of production, not persuasion, and the employer " ' "need not persuade the court that it was actually motivated by the proffered reasons . . . [but only] raise[] a genuine issue of fact as to whether it discriminated against the [plaintiff]." ' " (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 201 (*Caldwell*).) Once the employer satisfies this burden, the presumption of discrimination created by a prima facie case " ' "drops from the case" and the factfinder must decide upon all of the evidence before it whether [the] defendant intentionally discriminated against [the]

plaintiff.  [Citation.]  In short, the trier of fact decides whether it believes the employer's explanation of its actions or the [plaintiff's].' "[5]  (*Caldwell*, at p. 201.)

The *McDonnell Douglas* framework was designed as "an analytical tool for use by the trial judge in applying the law, not a concept to be understood and applied by the jury in the factfinding process." (*Caldwell, supra*, 41 Cal.App.4th at p. 202.)  "[I]n the usual case, the first two prongs of the [framework], that is, whether the plaintiff has stated a prima facie case of discrimination and whether the employer has rebutted that prima facie showing, will be tested prior to trial," such as through a motion for summary judgment. (*Ibid.*)  Because the framework is an analytical tool for evaluating the legal merits of a claim, it "does not affect the procedural rule . . . that imposes on a defendant the initial burden when that party seeks summary [judgment]." (*Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 926.)

2.     The standards governing Western Dental's motion for summary judgment and our review of the trial court's ruling.

The standard for granting summary judgment is familiar.  Summary judgment is appropriate if "there is no triable issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)  For a defendant to meet its initial burden when moving for summary judgment, it must demonstrate " 'that a cause of action has no merit' " by showing either " 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action.' " (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849, quoting Code Civ. Proc., § 437c, subd. (*o*)(2).)  In the context of an employer's

---

[5] On appeal, Abed offers two theories for why her failure to apply for a position is not fatal to her claim.  The first is that applying for a position cannot be a required element of her prima facie case because she cannot logically be expected to have applied for a position she was falsely told did not exist.  The second is that the *McDonnell Douglas* framework is inapplicable because she provided direct evidence of discriminatory intent.  (See *Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1144-1145.)  We need not resolve whether she was excused from establishing a prima facie case under *McDonnell Douglas* because, even if she was not, she presented more than enough evidence to support an inference of discrimination.

10

motion for summary adjudication of a discrimination claim, this means the employer " 'has the initial burden to present admissible evidence showing either that one or more elements of [the] plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' " (*Serri, supra*, 226 Cal.App.4th at p. 861.)

Once a defendant satisfies its initial burden, "the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) In the context of an employer's motion for summary adjudication of a discrimination claim, this means "the burden shifts to the [plaintiff] to 'demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action.' " (*Serri, supra*, 226 Cal.App.4th at p. 861, italics omitted; see also *Caldwell, supra*, 41 Cal.App.4th at p. 203 [plaintiff must "produce[] admissible evidence which raises a triable issue of fact material to the defendant's showing" to avoid summary judgment].) Thus, "by applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, 'the judge [will] determine whether the litigants have created an issue of fact to be decided by the jury.' " (*Caldwell*, at pp. 202-203, quoting *Texas Dept. of Community Affairs v. Burdine* (1981) 450 U.S. 248, 255, fn. 8.)

In most cases alleging a failure to hire for discriminatory reasons, the prima facie case includes as an element a showing that the plaintiff applied for the job. This is usually an element because it establishes that the employer knew the plaintiff was actually seeking a job. (See *Guz, supra*, 24 Cal.4th at p. 355.) But, as we discuss further below, the elements of a prima facie case under *McDonnell Douglas* can vary depending on the plaintiff's allegations, and the plaintiff need not establish any particular element so long as he or she ultimately presents enough evidence to support an inference that an employment decision was discriminatory. Thus, even when a defendant employer has

11

presented evidence undermining a usual prima facie element, a plaintiff can still defeat summary judgment by presenting evidence that establishes a prima facie case in a different way or otherwise creates triable issues as to whether the employer engaged in actionable discrimination.

In evaluating a grant of summary judgment, we review the record de novo, "liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) If summary judgment was properly granted on any ground, we affirm "regardless of the trial court's stated reasons." (*Syngenta Crop Protection, Inc. v. Helliker* (2006) 138 Cal.App.4th 1135, 1155.) Although summary judgment is no longer a disfavored procedure, "many employment cases present issues of intent, and motive, and hostile working environment, issues not determinable on paper . . . [and] rarely appropriate for disposition on summary judgment, however liberalized it be." (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 286.)

C.    *There Are Triable Issues as to Whether Western Dental Intentionally Discriminated Against Abed by Falsely Telling Her That No Job Was Available.*

Western Dental contends that it was entitled to summary adjudication of the FEHA claim because, as both parties agree, Abed did not apply for a dental assistant position. We are not persuaded. Although Western Dental negated an element of the prima facie case that often applies in failure-to-hire claims, this was not a typical failure-to-hire claim. Abed was not required to show that she submitted an application to prevail because she raised triable issues as to whether Western Dental intentionally discriminated against her because she was pregnant by falsely telling her no position was available and thereby causing her not to apply for one.

1.    Abed's FEHA claim is not defeated by her failure to apply for a dental assistant position.

We begin by rejecting Western Dental's argument that Abed's claim "fails as a matter of law" because Abed never applied for a dental assistant position. "The prima

12

facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." (*Swierkiewicz v. Sorema N.A.* (2002) 534 U.S. 506, 510.) Its purpose is "to eliminate at the outset the most patently meritless claims" (*Guz, supra*, 24 Cal.4th at p. 354), and "[a] plaintiff's burden in making a prima facie case of discrimination is not intended to be 'onerous.' " (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 322.) Thus, "[t]he importance of *McDonnell Douglas* is *not* in its specification of the discrete elements of proof but is instead in its recognition that the . . . plaintiff carries the initial burden [at trial] of offering evidence which creates an inference that an employment decision was based on an illegal discriminatory criterion." (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1750, some italics omitted, citing *Teamsters v. United States* (1977) 431 U.S. 324, 358 (*Teamsters*).) "Moreover, the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.' " (*Swierkiewicz*, at p. 512.) Although we recognize that in most cases, a plaintiff who did not apply for a position will be unable to prove a claim of discriminatory failure-to-hire, a job application is not an *element* of the claim.

In its ruling, the trial court properly recognized that Abed's failure to apply for a dental assistant position did not automatically defeat her FEHA claim. But the court nonetheless concluded that Abed failed to establish a prima facie case of pregnancy discrimination because she could not establish that filing an application would have been futile under the futile-gesture doctrine. This doctrine was announced by the United States Supreme Court in *Teamsters*. In that case, class claims alleged that the employer "had engaged in a pattern or practice of discriminating against minorities in hiring . . . line drivers," and the plaintiffs, who were incumbent employees, sought "an opportunity to transfer to line-driver jobs with full company seniority for all purposes." (*Teamsters, supra*, 431 U.S. at pp. 329-330.) In addressing appropriate remedies, the Court rejected the employer's contention "that a person who has not actually applied for a job can *never* be awarded seniority relief." (*Id.* at p. 365.) It explained, "The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who

13

were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection. [¶] . . . When a person's desire for a job is not translated into a formal application solely because of his [or her] unwillingness to engage in a futile gesture he [or she] is as much a victim of discrimination as is he [or she] who goes through the motions of submitting an application." (*Id.* at pp. 365-366.)

We disagree with the trial court that the survival of Abed's FEHA claim depended on the futile-gesture doctrine. The claim is not that it would have been futile for Abed to apply (even if it might have been) so much as it is that Western Dental caused her not to apply by falsely telling her for discriminatory reasons that no position was available. This is a different, but also legitimate, reason for her not to have applied. And because the futile-gesture doctrine has little applicability here, we disagree with the court's determination that it mattered that Abed presented no evidence of a "consistently enforced discriminatory policy." (*Teamsters, supra*, 431 U.S. at p. 365.) While *Teamsters* involved claims of pattern-or-practice discrimination and focused on the presence of a "consistently enforced discriminatory policy," the decision did not hold that such a policy is the *only* means by which a plaintiff can come to believe that an application would be futile.

In any event, *Teamsters* suggests that relief is available more broadly for discriminatory acts that "deter job applications." (*Teamsters, supra*, 431 U.S. at p. 365.) As the Supreme Court recognized, an employer can discourage a potential applicant not just by making explicitly discriminatory statements but also "more subtly . . . by [its] consistent discriminatory treatment of actual applicants, by the manner in which [it] publicizes vacancies, [its] recruitment techniques, [and its] responses to casual or tentative inquiries." (*Ibid.*) Abed has presented evidence that because she was pregnant she was falsely told that no position was available in the Napa office. In our view, this is enough to support a claim under the FEHA. Employers who lie about the existence of

14

open positions are not immune from liability under the FEHA simply because they are effective in keeping protected persons from applying.

Several federal decisions support our conclusion.[6] As an outgrowth of the directive that "courts must be sensitive to the myriad of ways . . . an inference [of discrimination] can be created," these cases have held that "the failure to formally apply for a job opening will not bar a Title VII plaintiff from establishing a prima facie claim of discriminatory hiring, as long as the plaintiff made every reasonable attempt to convey his [or her] interest in the job to the employer." (*EEOC v. Metal Service Co.* (3d Cir. 1990) 892 F.2d 341, 348 (collecting cases).) Courts have applied this principle where, as a result of discriminatory acts, plaintiffs were unaware of job openings. The Eighth Circuit Court of Appeals, for example, concluded that an African-American plaintiff had established a prima facie case under *McDonnell Douglas* where he expressed interest in being promoted, but the employer never posted a vacancy for a more senior position and it was filled by a white woman before the plaintiff learned of it. (*Paxton v. Union Nat. Bank* (8th Cir. 1982) 688 F.2d 552, 568.) Here, Abed not only expressed interest in a dental assistant position but was also affirmatively told there were no openings, and a subsequent extern filled such a position within weeks.

Two district court cases cited by Abed also support the conclusion that she could not reasonably be expected to apply for a vacancy she was told did not exist. In *Rodgers v. Peninsular Steel Co.* (N.D.Ohio 1982) 542 F.Supp. 1215 (*Rodgers*), the district court considered whether an African-American plaintiff who did not apply for an opening that his employer did not publicize but filled with a white applicant had established a prima facie case of discrimination. (*Id.* at pp. 1216, 1218.) Rejecting the employer's argument that the plaintiff had failed to demonstrate his interest in the position as *Teamsters* required, the district court concluded that where a "*non-informed* non-applicant has

---

[6] A pregnancy discrimination claim under the FEHA "is analogous to a federal claim under Title VII of the Civil Rights Act of 1964," and "federal cases interpreting title VII are instructive when analyzing a FEHA claim." (*Spaziano v. Lucky Stores, Inc.* (1999) 69 Cal.App.4th 106, 110, 112.)

shown that the failure to notify him [or her] was improper, and that he [or she] would have been interested had he [or she] been notified," he or she "thereby attains the presumption of the applicant. To require any more of him [or her] would be to demand the unreasonable." (*Rodgers*, at pp. 1218-1220.)

Similarly, in *Curran v. Portland Super. Sch. Committee., etc.* (D.Me. 1977) 435 F.Supp. 1063 (*Curran*), an employer did not give notice of a job opening to the plaintiff or its other qualified female employees but instead "privately offered the position to a male whose qualifications were inferior to [the] plaintiff's." (*Id.* at p. 1070.) The district court concluded that the plaintiff had established a prima facie case of discrimination despite not applying for the position, because under *Teamsters* the "failure of an incumbent employee to formally apply for a job does not constitute a *per se* barrier to relief," and the plaintiff alleged that her employer's discriminatory practices "made it impossible for her to apply." (*Curran*, at p. 1072.)

In attempting to distinguish *Rodgers* and *Curran*, Western Dental focuses on the failure by both of the employers in those cases to publicize the openings not only to the plaintiffs but also to others in the plaintiffs' protected classes. Western Dental argues that it publicly posted the Napa dental assistant position, and Abed "offer[ed] no evidence that pregnant women were prevented from applying in any manner." But Abed was already an extern and had a preexisting relationship with the company. There is no logical reason to require her to show that Western Dental had a broader policy of discouraging pregnant women from applying to prove the company discriminated against *her* by telling her no position existed. And although Western Dental points out that it employs many women in the Napa office, including women who have taken maternity leave while at the company, it did not produce evidence of how it has treated other pregnant women in the hiring process.

In short, we conclude that summary adjudication of the FEHA claim was not justified on the basis that Abed's failure to apply for a position meant she was unable to establish a prima facie case of pregnancy discrimination under the *McDonnell Douglas* framework. Although Western Dental claims that Abed's failure to apply also

16

constituted a legitimate nondiscriminatory reason for not hiring her, we need not address this argument. It does not matter whether we conceptualize the evidence as creating a prima facie case of discrimination to which Western Dental failed to respond with a legitimate nondiscriminatory reason or as demonstrating that the company's proffered reason was pretextual. As we now turn to explain, Abed satisfied her responsive burden either way by raising triable issues as to whether Western Dental intentionally discriminated against her.

 2. Triable issues exist as to whether Western Dental engaged in intentional discrimination.

Abed presented significant evidence that Western Dental acted with "discriminatory animus" by telling her there was no opening for a dental assistant in the Napa office. (*Serri, supra*, 226 Cal.App.4th at p. 862.) Strickling made several remarks suggesting she did not want Abed to work in Napa because she was pregnant. DeHaro testified that Strickling told her "something to the effect that if [Abed] were pregnant, it would not be convenient for the office," and, according to Abed, Strickling told DeHaro, "[W]ell, if [Abed is] pregnant, I don't want to hire her." On Abed's last day, Strickling told Abed to contact the Napa office after she had her baby to see if she could get a job there, permitting the inference that Abed would not be considered for a position while she was pregnant. In addition, it is undisputed that Strickling told Abed there were no dental assistant positions available in the Napa office, and Abed presented evidence that Strickling's representation was false. This evidence included that there was an open requisition for such a position, the position was publicly posted, and the position was filled shortly after Abed finished her externship. Indeed, there was evidence that Quintana was accepting applications for the position while Abed was still working there. As a whole, this evidence satisfied Abed's burden of demonstrating triable issues as to whether Western Dental intentionally discriminated against her by discouraging her from applying to become a dental assistant.

Western Dental contends that even if Strickling's comments were discriminatory, Abed "has not presented any evidence whatsoever that anyone with hiring authority was

17

aware of her pregnancy at the time of her externship or that [the company] had any discriminatory animus towards pregnant candidates." To avoid summary judgment, however, a plaintiff "need not demonstrate that every individual who participated in the failure to hire him [or her] shared discriminatory animus." (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551.) Rather, "showing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus." (*Ibid.*) Although Strickling was not responsible for making the ultimate decision to hire an applicant, she was clearly involved in the general process by which externs obtained permanent positions: she supervised externs and evaluated their performance. She was also involved in the specific events that led Abed not to apply: Abed asked Strickling whether a dental assistant position was open, Strickling spoke to Quintana to find out, and Strickling relayed to Abed that there was no opening. Were this a typical failure-to-hire case in which a plaintiff was not hired after completing the application process, the evidence of Strickling's limited involvement in hiring decisions might defeat the imputation of her discriminatory animus to Western Dental. Here, however, the allegedly discriminatory act that led to Abed's not being hired was the thwarting of her application by falsely representing there was no opening, and there is evidence Strickling played a key role in effectuating that act.

Western Dental also argues that some evidence demonstrates Abed did not apply for a dental assistant position because she was not interested in one, not because she was discouraged from doing so. It points to her acknowledgment that before her externship was over she learned a position in the Napa office was posted online, her failure to apply for positions in other Western Dental offices, and her failure to ever apply to become a dental assistant at any company. This evidence may create a dispute about Abed's reasons for not applying to the Napa office, but it does not conclusively establish that she would have not applied for the position had she been truthfully told one was available. She told Strickling she wanted a job in the Napa office, asked whether there was a dental assistant position available, and specifically testified that she did not apply for a job with

18

Western Dental because she "was told there [were] no openings." If Western Dental falsely and for discriminatory reasons misrepresented that there was no dental assistant position available in the Napa office, it is hardly surprising that Abed did not seek a job there once she discovered she had been lied to. Nor can Western Dental escape liability for past discriminatory acts merely because Abed did not demonstrate an ongoing interest in becoming a dental assistant by applying for similar positions, including in offices that were inconveniently located. We recognize that this case involves many disputed factual issues, and a jury may eventually agree with Western Dental that it did not intentionally discriminate against Abed. But Abed has presented enough evidence to entitle her to a trial on her FEHA claim.

## III.
### DISPOSITION

The judgment is reversed in part as to Abed's claim for pregnancy discrimination under the FEHA and affirmed in part as to her claim for invasion of privacy. The case is remanded for further proceedings consistent with this opinion. Abed is awarded her costs on appeal.

19

_____

Humes, P.J.


We concur:


_____

Margulies, J.


_____

Banke, J.


*Abed v. Western Dental Services, Inc.*  A150933

20

Trial Court:

     Napa County Superior Court


Trial Judge:

     Hon. Rodney G. Stone


Counsel for Plaintiff and Appellant:

     Michael von Loewenfeldt, Kerr & Wagstaffe LLP

     Gary E. Moss, Law Offices of Moss & Hough

     Mary Patricia Hough, Law Offices of Moss & Hough


Counsel for Defendant and Respondent:

     Gregory G. Iskander, Littler Mendelson, P.C.

     Christina L. Piechocki, Littler Mendelson, P.C.

*Abed v. Western Dental Services, Inc.*  A150933