Filed 5/23/22  Fishbaugh v. City of Auburn CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| CONNIE FISHBAUGH, | C090863 |
| Plaintiff and Appellant, | (Super. Ct. No. SCV0039348) |
| v. | |
| CITY OF AUBURN, | |
| Defendant and Respondent. | |

The trial court granted summary judgment to defendant City of Auburn on a complaint by plaintiff Connie Fishbaugh for employment discrimination and retaliation and failure to correct discrimination.  Fishbaugh is transgender.  Fishbaugh, a former law enforcement officer in Florida, applied for a reserve officer position with the Auburn Police Department (the Department).  Fishbaugh alleged that she was encouraged to apply, but when she disclosed her gender identity, the attitude towards her turned negative, leading her to be disqualified from consideration.

We will affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

In early fall 2013, Fishbaugh left a voicemail with Officer Gary Sage requesting to do a ride-along and expressing interest in applying for the Department's reserve officer program. Fishbaugh stated that she had a private investigator business. Before returning the call, Sage did a Google search regarding the nature of Fishbaugh's investigation work. The search revealed that Fishbaugh was involved in a legal proceeding against another law enforcement agency with allegations concerning her being transgender.

During a six-hour ride-along with Sage, Fishbaugh revealed that she was a street musician and had recently played guitar in Central Square in Auburn, when a police officer with the Department informed her that a city ordinance prohibited playing outside in the square. Fishbaugh said it was wrong for the police to tell her to leave when people were enjoying the music. Sage explained that the city had an ordinance that prohibits amplified music in public and the officer's request was not personal.

During the ride-along, Fishbaugh said she had prior law enforcement experience. Sage encouraged Fishbaugh to apply.

A few months later, Fishbaugh came back for another ride-along with Sergeant Hardesty. During the ride-along, Hardesty expressed his religious beliefs. Fishbaugh told him his beliefs condemned others and asked him multiple times to stop. The ride-along ended with Hardesty telling Fishbaugh to come back for another ride-along.

In December 2013, Fishbaugh came to the Department and asked to speak to Sage. Fishbaugh said she had come in for a third ride-along and was informed the policy on the number of ride-alongs had changed. Fishbaugh said she felt she was being singled out to deny her a ride-along. Fishbaugh told Sage about the ride-along with Hardesty where he proselytized religious beliefs that Fishbaugh found disturbing and asked him to stop. Sage explained that the policy had changed to permit only one ride-along in a six-month period. Sage offered to show Fishbaugh the policy. Fishbaugh said she disagreed with

2

the policy and the Department should encourage a potential applicant to come on multiple ride-alongs.

In August 2014, Fishbaugh applied for a position with the Department. Sage conducted her background investigation and interviewed her. On October 31, 2014, Fishbaugh called Sage to inquire about scheduling the interview and he called back to tell her that the interview could take place that evening. Fishbaugh said she needed extra time to explain about being transgender and her past experiences, and Sage said Fishbaugh would have the time.

At the interview, Fishbaugh gave Sage her personal history statement (PHS), which Fishbaugh had filled in by hand and parts of which Sage had trouble reading. Fishbaugh included a letter from a surgeon regarding her gender reassignment surgery, which Sage gave back to Fishbaugh with the explanation that he did not review medical information. Sage explained that the purpose of the interview was to review the PHS and any clarifications or corrections Fishbaugh would make to it. Sage explained he would present the results of his investigation to the chief of the Department, John Ruffcorn.

With the PHS, Fishbaugh also submitted a document titled "Wrongful Termination Synopsis Supplement." On the PHS, Fishbaugh had checked "Yes" on boxes asking whether she had ever been disciplined or asked to resign and referenced the supplement. In the supplement, Fishbaugh stated that "unexpected negative pushback as a result of my being transgender" led her to resign from the sheriff's office in Orange County, Florida, as well as that she had received "a very wrongful termination" from the sheriff's office in Brevard County, Florida, which Fishbaugh succeeded in legally overturning and was allowed to resign with a letter of reference from the county sheriff.[1]

---

[1] The sheriff's letter addressed "To Whom It May Concern" states: "The Sheriff of Brevard County employed Connie Fishbaugh from April 30, 2001 until January 28, 2002.

Fishbaugh emphasized that "none of the difficulties I encountered on either agency involved any kind of officer misconduct on my part whatsoever."

Fishbaugh described the circumstances surrounding her resignation from the Orange County Sheriff's Office. Fishbaugh stated that she reported abuse of force by a K-9 handler to a lieutenant, describing how the handler allowed his dog to bite a traffic stop suspect. Instead of making a report and starting an investigation, the lieutenant told her she was not a " 'team player.' " This incident led to a growing hostile work environment, especially after Fishbaugh revealed she needed gender reassignment. Fishbaugh decided to resign and come back to law enforcement later.

At Brevard County, Fishbaugh stated a group of individuals were unsupportive of her gender reassignment, which led to a hostile work environment that increased until there was a "very wrongful termination led by a high ranking member of that group . . . ." Fishbaugh stated: "I was a very effective deputy, and my work performance was above average." Fishbaugh filed a claim with the Florida human relations commission and settled for resignation in lieu of termination and the sheriff's letter of reference. Fishbaugh stated "there should be no remaining negative information from the Brevard County S.O. if they are contacted," and "if any such feedback is received, it will be inaccurate to say the least, and reflective of what I described above."

Fishbaugh concluded: "I made a consistent, reasonable effort to stand up for myself in many of those negative situations I encountered, and in the process of a futile attempt to do so, a few individuals in supervision on the agency sought to falsely characterize me as being 'insubordinate' and having 'poor interpersonal skills'. I was never once insubordinate, and interpersonal skills have always been one of my strongest attributes."

---

Ms. Fishbaugh satisfactorily completed the agency's field training program and met expected performance standards during her quarterly performance review."

4

On January 22, 2015, Sage submitted a background report on Fishbaugh, which Ruffcorn reviewed. The report described the initial contacts with Fishbaugh prior to the background investigation, including the ride-alongs with Sage and Hardesty, Fishbaugh's complaint about officers telling her not to play guitar in Central Square, Fishbaugh's being denied a third ride-along, and her telling Sage about her bad experience in the second ride-along with Hardesty, as well as the poor treatment Fishbaugh said she received in connection with a ride-along with the Woodland Police Department.

Sage's description of the interview included Fishbaugh's explanation of issues that arose in her prior employment experience with the sheriff's offices in Brevard County and Orange County.

According to the report, while with the Brevard County Sheriff's Office, Fishbaugh stated that she received two letters of reprimand and a third complaint that was unresolved prior to the end of her employment. She was terminated but legally overturned that decision and was allowed to resign in lieu of termination. Fishbaugh said she wanted to explain the "opposition" she encountered in the sheriff's department. Sage said he would allow her to explain but wanted to keep within the focus of the background investigation and he would be confirming all information Fishbaugh provided. Fishbaugh interjected that "the sheriff's department would not confirm her version and would lie about what happened during her employment" and would only share information from "a faction of people who did not want her there."

Fishbaugh went on to describe her request for a transfer to a precinct where the commander was "better" and the deputies would be more " 'supportive.' " She met with the commander of that precinct to discuss the transfer. Her current commander found out, called her in for a meeting with two lieutenants, and said she had gone outside the chain of command. Fishbaugh told him she did not do anything outside the chain of command. Fishbaugh said " '[t]hey tried to make it out like I had committed some federal crime' " and " 'were just looking for something to write me up for.' " She

5

received a disciplinary letter. Fishbaugh said she was wrongly written up and believed what she did was within her rights.

Fishbaugh described another incident where she wanted to arrest a father in a family dispute. She called for backup and the corporal responding told her not to make the arrest. Fishbaugh put in her report that the corporal would not allow her to make the arrest and the corporal directed her to remove his name. Fishbaugh refused and a sergeant told her to remove the corporal's name. Again, she refused. Fishbaugh was accused of insubordination. Fishbaugh defended her actions and blamed the corporal for trying to lie in the report.

The final incident in Brevard County involved an arrest Fishbaugh made for marijuana possession. A sergeant told Fishbaugh to release the prisoner. Fishbaugh told the sergeant she was going over his head because he had given a wrong order and she called a superior officer. The sergeant called the precinct commander, who told Fishbaugh she had disobeyed an order from her sergeant. Fishbaugh said the order was invalid and the commander told her she was " 'done' " and demanded her gun and badge. Fishbaugh told Sage, " 'I couldn't believe it. He's destroying me for no cause.' " Internal affairs investigated and Fishbaugh was terminated for insubordination. Fishbaugh filed a complaint with the Florida human relations commission and she was allowed to resign in lieu of termination.

Regarding the Orange County Sheriff's Office, Fishbaugh said she resigned because of the " 'negativity' " of the other deputies, who she felt were always finding fault with her. Fishbaugh received three letters of reprimand at this office. The first issue involved her failing to change the oil on schedule in her take-home patrol car. The second issue involved a theft at a 7-11 store where Fishbaugh responded to assist an officer from another jurisdiction who was following the suspect's car. Her sergeant told her not to assist unless the other agency asked for assistance. She radioed the other officer and asked if he needed assistance, which he said he did. Fishbaugh's sergeant

6

came back on the radio yelling at her to discontinue, which she did. The sergeant gave Fishbaugh a written reprimand for insubordination. Fishbaugh claimed she was wrongly written up. She questioned why her sergeant took her off a call to assist another officer.

The third incident in Orange County occurred when Fishbaugh was at the end of her shift. She was the security officer for the apartment complex where she lived, which was near her beat. She went to lock up the pool area and a tenant told there was suspicious activity on the other side of the complex. She jogged over and someone called 911. Fishbaugh received a written reprimand for being out of her beat and conducting personal business while on duty. Fishbaugh told the sergeant that he was " 'really reaching here,' " because other officers were allowed to go miles out of their zones without consequence.

Fishbaugh said none of three reprimands were serious and the backup call reprimand " 'was completely unwarranted, I should have been backing up the officer.' "

Sage identified areas of concern regarding Fishbaugh taken from the Peace Officer Standards and Training (POST) background investigation manual, including: (1) under "Impulse Control," "Over reacts when challenged or criticized" and "Reprimands, counseling and terminations for poor behavior control at work"; (2) under "Stress Tolerance," "Argumentative," "Disrupts/undermines authority," "Does not accept for responsibility for actions and /mistakes [*sic*]. Blames others" and "Minimizes the importance of errors"; (3) under "Conscientiousness (Work Habits)," "Fails to analyze prior mistakes or problems to improve performance," "Disciplined at work for insubordination," "overlooked instructions on PHS" and "Reprimanded for poor work performance six times at law enforcement agencies"; and (4) under "Interpersonal Skills," "Argumentative" and "Challenging to Authority."

Based on his review of Sage's report, Ruffcorn told Sage to discontinue further investigation and disqualified Fishbaugh for employment as a reserve officer in the Department. On January 28, 2015, Ruffcorn wrote Fishbaugh that the background

investigation had been discontinued because she did not meet one or more POST standards.

On February 6, 2015, Fishbaugh wrote Ruffcorn in response. Fishbaugh asked Ruffcorn to give Fishbaugh an opportunity to address the concerns Sage and Ruffcorn may have had that led to Fishbaugh's disqualification. Fishbaugh wrote: "There are some individuals who may have provided dishonest or misleading information unfortunately, which is all the more reason an applicant deserves a chance to speak on their own behalf to any alleged 'negative' information found on background." Fishbaugh wanted to give Ruffcorn "a broader understanding of the gross negativity and utter lack of basic support I encountered on my first two agencies, which may likely be the main source of any 'alleged' negative background info you received." Fishbaugh stated: "After the extremely negative experience I had with one of my Sergeants on Brevard County . . . he later tried to falsely characterize the problem as being my lack of 'interpersonal skills'. I frequently had to defend myself unnecessarily from an ongoing lack of support not only from him, but several others who did not want me on the agency."

Fishbaugh described the incident where she was written up for violating the chain of command because she spoke with the commander for the precinct Fishbaugh wanted to transfer to before speaking to her current precinct commander. Fishbaugh wrote that she did not violate the chain of command because she had spoken with her current commander about wanting a transfer to another precinct and the commander of the other precinct agreed that it was okay. Fishbaugh claimed her current commander "was one of the ones who did not really want me there" and "certain key individuals in command positions consistently made an effort to actually prevent letting me go where I had found the basic support I needed from a commander." Fishbaugh said she felt "contempt" from other officers "like they only wanted me to fail, and the better job I did, the more resolve

8

they had to make things unbearable for me," which "led to multiple situations where I had to unexpectedly defend myself from endless false spin from certain key individuals."

Fishbaugh described the "very solid drug arrest" where a sergeant ordered her to release the individual. Fishbaugh argued that "[a]ll I did in response to this unlawful order that night was to ask to speak first to the higher authority of the on duty watch commander, which was my right to do so under the circumstances." Fishbaugh suggested the sergeant "pre-planned for the situation" to have the precinct commander arrive and demand Fishbaugh's badge and gun. The precinct commander disregarded the circumstance of the arrest and accused Fishbaugh of " 'insubordination' for not just obeying the sergeant's order to just release the suspect without any question. This was just an excuse they were fabricating at the time to 'manufacture fault' where there wasn't any fault on my part. They wanted to go out of their way to show me the extent of their disdain and lack of support." Fishbaugh concluded that "any information you would likely receive from Brevard County would be extremely inaccurate and in many places blatantly dishonest."

Fishbaugh wrote that she also shared with Sage the "specific ridiculous treatment" she received in the Orange County Sheriff's Office for reporting a K-9 handler for abuse of force and was shocked at the lieutenant's response that Fishbaugh was not a " 'team player.' " Fishbaugh wrote: "This is just one of many such examples that took place on Orange County. So you should understand from the overall picture why I might not necessarily have a 'favorable' rating from both agencies. But there was never any misconduct on my part, only negativity stemming from a lack of support."

On November 16, 2017, Fishbaugh sued the city for employment retaliation and discrimination under the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA). Fishbaugh's allegations included that during the interview she told Sage "about what she had dealt with and overcome in her prior experience as a transgender deputy sheriff in Florida," revealing that "she had been forced to make a

9

prior employment discrimination complaint in her previous police employment due to a severely hostile work environment, which was directly as a result of her being transgender." Fishbaugh further alleged she had sent a letter to Ruffcorn detailing the complaint "about being denied employment because of her gender identity and prior discrimination complaints," but Ruffcorn chose not to correct discrimination and retaliation against Fishbaugh but rather ratified it.

On August 13, 2018, Fishbaugh was deposed. Fishbaugh recounted the incident where she was ordered not to assist an officer from another jurisdiction. Fishbaugh testified: "It was wrong discipline. It was mischaracterized. It was inappropriate. He claimed I didn't follow his order, when I did. He told me to stop, and I did. I backed off. [¶] And then he tried to later write me up and say that I violated his order when his order had only happened at the point that I backed off. He didn't give me an order the first time. He said he needed to be -- he needed to request a response. [¶] And so he tried to say, 'When I told you that, you violated my order.' [¶] I said, 'That's absolutely not -- that's clearly not what happened.' [¶] So this was the kind of example of what I was running into once I revealed that I was transgender. They would mischaracterize and try to twist and then write me up when I didn't --"

The city moved for summary judgment, supported by a declaration of Ruffcorn stating his reasons for disqualifying Fishbaugh. One such reason was that "despite having been disciplined multiple times by two law enforcement agencies in Florida, Ms. Fishbaugh took no responsibility for her own conduct. She instead blamed others, made excuses and minimized the importance of her own admitted errors in her prior law enforcement employment. For these reasons, I determined Ms. Fishbaugh possessed neither the general POST qualities required of an officer nor the qualities I value for Auburn PD, sufficient to pass her background investigation."

The trial court granted the city's motion. The court held that Fishbaugh's evidence established a prima facie showing of discriminatory motive, but the city had

10

satisfied its burden to establish a legitimate, nondiscriminatory reason for not hiring Fishbaugh. Among those reasons "were numerous indications that plaintiff had a tendency to challenge authority, including admitted refusals to comply with orders from her superiors, and she refused to acknowledge any responsibility in connection with prior law enforcement disciplines." Fishbaugh was unable to show that these reasons were pretextual because she "does not dispute that she does not believe she bears any responsibility in connection with prior law enforcement disciplines." The court rejected Fishbaugh's retaliation claim on the same basis. Finally, the court held that because Fishbaugh failed to establish a triable issue of material fact on first two claims, her third claim for failure to correct or prevent discrimination also failed.

## DISCUSSION

We conclude that Fishbaugh's complaint could not survive summary judgment, because Fishbaugh confirmed that she took no responsibility for her actions that led to multiple incidents of discipline in her prior law enforcement employment, asserted that discipline was wrongly imposed, and blamed others for each incident. Thus, Fishbaugh herself established that the city had a legitimate, nondiscriminatory reason for not hiring her.[2]

---

[2] Ruffcorn referred to "a number of matters" in the background report that led him to disqualify Fishbaugh: her PHS omitted an alias; Fishbaugh played a police sergeant abusing a suspect in a comedy video; the PHS omitted that Fishbaugh had applied to the El Dorado County Sheriff's Office and failed to qualify due to her omission that she failed to pay taxes on a construction job; and Fishbaugh's conduct during the ride-alongs and interactions with Department officers, which indicated she "was argumentative, combative, easily agitated, and lacking in impulse control, including when confronted by an officer about playing music in violation of the city ordinance." "When an employer offers more than one independent, legitimate, non-discriminatory reason for an adverse employment action, even if one is found to be pretextual but at least one other is not, the defendant employer is still entitled to summary judgment." (*Jones v. St. Jude Medical S.C., Inc.* (6th Cir. 2012) 504 Fed.Appx. 473, 477-478; see also *Odima v. Westin Tucson Hotel Co.* (9th Cir. 1993) 991 F.2d 595, 600.)

11

# I

### Standard of Review

"On a motion for summary judgment, a defendant must show 'that one or more elements of the cause action . . . cannot be established, or that there is a complete defense to the cause of action.' (Code Civ. Proc., § 437c, subd. (p)(2).) Summary judgment is appropriate only 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (*Id.*, subd. (c).) A triable issue of material fact exists if the evidence and inferences therefrom would allow a reasonable juror to find the underlying fact in favor of the party opposing summary judgment. [Citation.]" (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 422 (*Arnold*).)

" ' " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Arnold, supra*, 53 Cal.App.5th at pp. 422-423.) " 'We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale. [Citation.]' [Citation.]" (*Id.* at p. 423.)

# II

### McDonnell Framework

The FEHA provides that it is unlawful for an employer to refuse to hire a person for employment because of "sex, gender, gender identity, gender expression . . . ." (Gov. Code, § 12940, subd. (a).)

"Failure-to-hire claims under the FEHA are evaluated under the burden-shifting framework of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792." (*Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 736 (*Abed*).) This framework

" 'reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially.  Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained.' [Citation.]  A plaintiff has the initial burden of producing evidence that establishes a prima facie case of discrimination.  [Citation.]  Although '[t]he specific elements of a prima facie case may vary depending on the particular facts,' the plaintiff in a failure-to-hire case '[g]enerally . . . must provide evidence that (1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he [or she] sought . . . , (3) he [or she] suffered an adverse employment action, such as . . . denial of an available job, and (4) some other circumstance suggests discriminatory motive,' such as that the position remained open and the employer continued to solicit applications for it.  [Citations.]" (*Ibid*.)

"If the plaintiff establishes a prima facie case, creating a 'presumption of discrimination,' the burden shifts to the employer to provide ' "a legitimate, nondiscriminatory reason for the challenged action." ' [Citation.]  Under the third step of the *McDonnell Douglas* framework, 'the "plaintiff must [then] . . . have the opportunity to attack the employer's proffered reasons as pretexts for discrimination, or to offer any other evidence of discriminatory motive." ' [Citation.]" (*Abed, supra*, 23 Cal.App.5th at p. 736.)  "Once the employer satisfies this burden, the presumption of discrimination created by a prima facie case ' " 'drops from the case' and the factfinder must decide upon all of the evidence before it whether [the] defendant intentionally discriminated against [the] plaintiff.  [Citation.]" ' [Citation.]" (*Id.* at p. 737, fn. omitted.)

On an employer's motion for summary judgment, the *McDonnell Douglas* test is modified.  (*Arnold, supra*, 53 Cal.App.5th at p. 425.)  "[T]he employer ' "has the initial burden to present admissible evidence showing either that one or more elements of [the] plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors." ' [Citation.]" (*Abed, supra*, 23 Cal.App.5th

13

at p. 738.) "Once a defendant satisfies its initial burden, 'the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto.' (Code Civ. Proc., § 437c, subd. (p)(2).)" (*Ibid.*) "[T]his means 'the burden shifts to the [plaintiff] to "demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." ' " (*Ibid.*) "The discrimination at issue must be a substantial motivating factor in the adverse employment decision." (*Arnold*, at p. 425, citing *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232.)

" '[S]ummary judgment for the employer may thus be appropriate where, given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred.' [Citation.]" (*Arnold, supra*, 53 Cal.App.5th at p. 426; see also *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1159 ["The employee's 'subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations' "].)

III

*Discrimination*

Fishbaugh contends that summary judgment should have been denied on her employment discrimination claim because there were disputed facts regarding, inter alia: (1) when and how the city first learned of Fishbaugh's transgender status; (2) who was involved in the decision not to hire Fishbaugh; (3) when and why the application process was discontinued; (4) why Fishbaugh's references were not checked; (5) whether Fishbaugh was argumentative in the ride-alongs or with the officers who told her to stop playing music; (6) Sage's failure to check Fishbaugh's references; (7) the refusal to let

14

Fishbaugh do a third ride-along; (8) the omissions from Fishbaugh's PHS; (9) Fishbaugh's satiric video about police abuse; and (10) failure to give Fishbaugh a second, "discrepancy" interview. Fishbaugh maintains the evidence on these matters "demonstrates that [the city's] stated reason for [Fishbaugh's] denial of employment was a mere pretext for discrimination."

Whether or not these issues were disputed, there can be no factual dispute that Fishbaugh refused to accept responsibility for her conduct that led to discipline imposed in prior law enforcement employment in Florida, the principal reason why Ruffcorn declined to hire her. To be sure, Fishbaugh acknowledges that Sage stated "Fishbaugh 'did not take responsibility for work related issues' in his report," but she contends Sage "omitted Fishbaugh's supplement from his report which contained an explanation of her claim against Brevard County for gender discrimination and wrongful termination and its outcome." However, Sage testified that he read the supplement after the interview. While the report did not mention the supplement, it covered Fishbaugh's explanation during the interview of the events leading to her resignation in lieu of termination. In any event, the supplement does not create a disputed issue as much as confirm Sage's report. In the supplement, for example, Fishbaugh maintained that "none of the difficulties I encountered in either agency involved any kind of officer misconduct on my part whatsoever."

Fishbaugh also argues that "Sage concluded Fishbaugh was 'insubordinate' in other work environments but did not speak to any of Fishbaugh's personal or employment references to determine if his statements about Fishbaugh's work habits were true." However, the manifest purpose of the supplement was to counter the negative information Fishbaugh anticipated Sage would receive from Florida law enforcement agencies. Fishbaugh stated that, because she was allowed to resign in lieu of termination, "there should be no remaining negative information from the Brevard

15

County S.O. if they are contacted," but "if any such feedback is received, it will be inaccurate to say the least, and reflective of what I have described above."

Moreover, in her letter to Ruffcorn, as well as in her deposition, Fishbaugh further confirmed—and, in fact, continued to demonstrate—that she did not and would not accept any responsibility for discipline imposed on her while employed at two Florida sheriff's offices, attributing each and every incident to wrongful, unlawful, unreasonable and biased actions by superior officers.

We conclude that in the supplement, letter and her deposition, Fishbaugh by her own words established that there was no triable issue whether the city had a legitimate, nondiscriminatory reason for declining to hire her. There can be no inference of discriminatory motive and pretext where the plaintiff's own words and actions confirmed the defendant's legitimate, nondiscriminatory reason for adverse action. (*McLee v. Chrysler Corporation* (2d Cir. 1997) 109 F.3d 130, 135-137; see also *Munizza v. State Farm Mutual Automobile Insurance Co.* (9th Cir. Dec. 5, 1996, No. 95-35794) 1996 WL 711563, * 3 [finding no pretext where plaintiff himself corroborated his poor performance]; *Pineda v. Philadelphia Media Holdings LLC* (E.D.Pa. 2008) 542 F.Supp.2d 419, 427 ["Plaintiff's own testimony corroborates Defendants' legitimate non-discriminatory reason" for transferring and terminating him]; *Shabazz v. Safe Horizons* (E.D.Mich. Sept. 13, 2011, No. 10-12066) 2011 WL 4072157, *9 [plaintiff's testimony that she knew she could be disciplined for failing to follow supervisors' directives, but considered this " 'nitpicking,' " corroborated defendant's legitimate, nondiscriminatory reasons for terminating her]; *Phillips v. DaimlerChrysler Corp.* (D.Del. Mar. 27, 2003, No. Civ.A. 01-247-JJF) 2003 WL 22939481, *8 [defendant's legitimate, nondiscriminatory reason for layoff was confirmed by plaintiff in deposition].)

In sum, Fishbaugh did not dispute the facts supporting Ruffcorn's legitimate concern that she did not take responsibility for conduct that led to discipline in Florida,

16

she repeated that behavior.  Accordingly, the trial court correctly granted summary judgment on Fishbaugh's discrimination claim.

## IV

### *Retaliation*

"[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  On a motion for summary judgment, California applies the burden-shifting framework of *McDonnell Douglas* to a claim for retaliation.  (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 942.)  Because Fishbaugh cannot raise a triable issue of pretext, her retaliation claim also fails. (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1021 (*Scotch*).)

## V

### *Failure to Prevent Discrimination and Retaliation*

Substantial evidence of discrimination and retaliation is a predicate for an action for failure to prevent discrimination and retaliation under the FEHA.  (Gov. Code, § 12940, subd. (k); *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1410; *Thompson v. City of Monrovia* (2010) 186 Cal.App.4th 860, 880; *Scotch, supra*, 173 Cal.App.4th at p. 1021; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.)  As Fishbaugh confirmed that the city's legitimate, nondiscriminatory reason for not hiring her was not pretextual, we affirm summary judgment on Fishbaugh's failure to correct claim.  (*Thompson*, at p. 880; *Scotch*, at p. 1021.)

17

## DISPOSITION

The judgment is affirmed.  The city shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

_____/s/_____
RAYE, P. J.

We concur:

_____/s/_____
HULL, J.

_____/s/_____
DUARTE, J.