Filed 7/10/20

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| KONG-BENG SAW,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>AVAGO TECHNOLOGIES LIMITED,<br><br>　　　Defendant and Respondent. | A153824<br><br>(San Mateo County<br>Super. Ct. No. CIV533681) |

Appellant Kong-Beng Saw worked for a Malaysian subsidiary of respondent Avago Technologies Limited (Avago). He was given the opportunity to acquire ordinary shares and stock options of Avago stock under a management shareholders agreement governed by the laws of Singapore. The shareholders agreement allowed Avago to repurchase shares and options at fair market value should an employee be terminated "for any reason whatsoever" within five years from the date of purchase. After Saw's position was eliminated in 2009, Avago repurchased his equitable interest. Saw sued Avago's subsidiary for wrongful termination and obtained a favorable judgment in Malaysia. Saw separately sued Avago in the Superior Court of San Mateo County, asserting that Avago breached the shareholders agreement by relying on an unlawful termination to repurchase his shares. Avago successfully moved for summary judgment, from which Saw now appeals. We conclude that Saw is not entitled to any relief under Singapore law and affirm the judgment below.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Saw, a Malaysian citizen, is a former employee of Avago Technologies (Malaysia) Sdn Bhd (Avago Malaysia), a subsidiary of Avago. Avago is a multinational company that designs, develops, and supplies a broad range of semiconductor devices. Saw's employment with Avago Malaysia commenced on December 1, 2005. He had been employed by Avago Malaysia's predecessors since 1980, working his way up from production engineer to general manager. His employment agreement with Avago Malaysia was governed under the laws of Malaysia.

Saw entered into a shareholders agreement with Avago in which he was allowed to purchase ordinary shares of stock and to exercise stock options in the parent company. Saw's right to retain his equitable interest was contingent on his continued employment for a five-year period from the date of purchase. Section 6(a)(i) of the shareholders agreement reads in relevant part: "If, on or prior to the fifth anniversary of the Purchase Date, (A) the Purchaser's active employment with the Company (and/or, if applicable, its Subsidiaries or Affiliates) is voluntarily or involuntarily terminated for any reason whatsoever . . ., a "Call Event" . . ., the Company shall have the right to purchase all or any portion of the Shares then held by the Purchaser."

Section 24 of the shareholders agreement provides that "[t]he laws of Singapore shall govern the interpretation, validity and performance of the terms of this Agreement, regardless of the law that might be applied under principles of conflicts of law." A forum selection clause under the same paragraph designates the Superior Court of San Mateo County for the resolution of any disputes between the parties arising out of the agreement.

In May 2006, Saw acquired 160,000 shares of Avago ordinary stock. He was also granted 137,500 options to purchase Avago shares at a price of $5 per share. On May 8, 2009, Avago Malaysia served Saw with a notice of termination, stating that his position had been eliminated due to downsizing. Saw signed his acknowledgement of the notice under protest. He ceased working for Avago Malaysia on June 1, 2009. By then, Saw had vested in 82,500 option shares.

On June 26, 2009, Avago issued call notices to repurchase Saw's 160,000 ordinary shares of stock and to cash out his 82,500 vested option shares. Saw protested this action. His shares were liquidated at the fair market value of $6.76 per share in accordance with the shareholders agreement. Avago paid Saw $1,226,800 in total, representing a profit to him of approximately $400,000.[1]

Saw commenced litigation against Avago Malaysia in July 2012 for wrongful termination before the Industrial Court of Malaysia. In May 2015, the Industrial Court dismissed his claim, concluding that the company's restructuring was not in bad faith and that his termination from employment was supported by just cause. In May 2016, the High Court of Malaysia reversed the Industrial Court's ruling and remanded the matter back to the Industrial Court for a determination of damages, including an "assessment for compensation in lieu of reinstatement."

In May 2015, Saw filed suit against Avago in the Superior Court of San Mateo County, asserting causes of action for breach of contract, breach of the covenant of good faith and fair dealing, and unjust enrichment. Avago moved for summary judgment on the ground that it had an unfettered right to

---

[1] At the time of Avago's motion for summary judgment in August 2017, Saw's shares reportedly would have been worth over $70 million.

repurchase its equitable interest under the shareholders agreement as construed by Singapore law. Avago relied in part on *Oracle Corp. v. Falotti* (9th Cir. 2003) 319 F.3d 1106 (*Falotti*), in which the Ninth Circuit held that under California law, the terms of a stock option agreement must be given effect regardless of whether an employee is improperly terminated under the laws of another jurisdiction. Avago contended that Saw's claim for unjust enrichment was untimely and without legal merit

Saw argued in opposition that Avago violated the express terms of the shareholders agreement by liquidating his shares and options when he was still legally employed under the laws of Malaysia. He based this contention on the premise that his termination had been deemed unlawful and void *ab initio* by the High Court of Malaysia. He also argued that the covenant of good faith and fair dealings does not permit an employer to profit from an illegal termination.

The trial court granted Avago's motion, concluding that Saw cannot establish as a matter of law that Avago breached the shareholders agreement because Saw's employment relationship with Avago Malaysia ended when he ceased rendering services for his employer. The court also found that a covenant of good faith and fair dealing could not be implied into the shareholders agreement under Singapore law, and Saw's claim for unjust enrichment could not be maintained because the parties had entered into an express agreement. Judgment for Avago was filed on March 6, 2018. This appeal followed.

## DISCUSSION

### I. *Standard of Review and Choice of Law*

The parties agree that while the shareholders agreement contains a choice of law provision that requires application of the substantive law of

4

Singapore to resolve this dispute, the procedural laws of the forum state—California—govern procedural matters. They are correct. (See *World Wide Imports, Inc. v. Bartel* (1983) 145 Cal.App.3d 1006, 1012 ["It is well established that while the courts generally enforce the *substantive* rights created by the laws of other jurisdictions, the *procedural* matters are governed by the law of the forum." (Italics added.].) Accordingly, we recite the familiar standards governing summary judgment.

Summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To meet its initial burden in moving for summary judgment, a defendant must "demonstrat[e] that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense to the action. [Citations.] Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists with regard to that cause of action or defense." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 100 (*Lona*).)

"In evaluating a grant of summary judgment, we review the record de novo, 'liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' " (*Abed v. Western Dental Services, Inc.* (2018) 23 Cal.App.5th 726, 738.) We "consider[] all the evidence set forth in the moving and opposition papers, except that to which objections have been made and sustained." (*Lona, supra,* 202 Cal.App.4th at p. 101.) "If summary judgment was properly granted on any ground, we affirm 'regardless of the trial court's stated reasons.' " (*Abed,* at p. 739.)

5

## II.  *Whether Avago Breached the Shareholders Agreement*

The principal question we must answer is whether Avago breached the shareholders agreement when it repurchased shares of company stock and options from Saw upon his termination of employment.  Contrary to Saw's contentions on appeal, whether his termination was lawful or unlawful under Malaysian law has no bearing on Avago's contractual right to repurchase shares acquired by a former employee.  The choice of law provision requires us to apply Singapore law, not the laws of Malaysia.  Under the express terms of the agreement, Avago may exercise the repurchase provision if an employee is voluntarily or involuntarily terminated "for any reason whatsoever"—language that broadly encompasses the circumstances that gave rise to Saw's dismissal.  Even if we were required to consider the employment law ruling by the Malaysian court, that court did *not* reinstate Saw to his previous position; he was instead awarded damages for his wrongful dismissal.  Because Saw's employment with Avago Malaysia indisputably ended on June 1, 2009, he cannot recover under the shareholders agreement as a matter of law.

### A.  The Law of Contract in Singapore

Many principles of contract interpretation under Singapore law will be familiar to legal practitioners in California.  "Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract." (*Goh Guan Chong v. AspenTech, Inc.* (Sing. 2009) SGHC 73, par. 53.)  Courts must "giv[e] effect to the objective intentions of the contracting parties" and in doing so must "consider the relevant contractual, contextual, and commercial background against which

6

the document containing the disputed words and phrases came about." (*Y.E.S. F&B Group Pte Ltd v. Soup Restaurant Singapore Pte Ltd* (Sing. 2015) SGCA 55, par. 30 (*Y.E.S.*).) "[P]articular importance must be given to the language chosen by the parties to express their intentions." (*Transocean Drilling v. Providence Resources* (Eng. 2016) EWCA (Civ) 372, par. 14, citing *Arnold v. Britton* (Eng. 2015) UKSC 36].)[2] The starting point to any analysis is thus the language of the contract itself. (*Transocean*, par. 14.)

The courts of Singapore apply a "contextual" or "commonsense" approach to contract analysis, balancing the text of the agreement with the context from which it derives. (*Y.E.S.*, *supra*, SGCA 55, par. 32.) Where the text is "*plain and unambiguous inasmuch as it admits of one clear meaning,*" and "there is nothing . . . in the context which militates against what is the plain language of the text itself," the unambiguous meaning controls. (*Y.E.S.*, par. 31; see *Singapore Airlines Ltd. v. Ahlmark* (Sing. 1999) 3 SLR(R) 637, 645 (*Ahlmark*) ["The court should try to uphold an agreement rather than to undo it. If a sensible meaning could be given to a provision so as to uphold it, the court should try to do so."].) Courts must examine the contract as a whole and should avoid "a construction which leads to very unreasonable results . . . unless it is required by clear words and there is no other tenable construction." (*Sheng Siong Supermarket Pte Ltd v. Carilla Pte Ltd* (Sing. 2011) SGHC 204, par. 40.) However, "the context cannot be utilized as an excuse by the court concerned to rewrite the terms of the contract according to its (subjective) view of what it thinks the result ought to be in the case at

---

[2] As the parties acknowledge, English legal authorities are "highly persuasive" in Singapore courts. (*Loh Siew Keng v. Seng Huat Construction Pte Ltd* (Sing. 1998) SGHC 197, par. 221.) We therefore rely on such authorities to inform our application of Singapore law.

hand." (*Y.E.S.*, par. 32, italics omitted.)  In short, "the court must ascertain, based on all the relevant objective evidence, the intention of the parties at the time they entered into the contract." (*Ibid.*, italics & other emphasis omitted.)

### B.    The Shareholders Agreement

We begin by examining the relevant provisions of the shareholders agreement.  Section 6(a)(i), the repurchase provision, states that if an employee purchaser's "active employment with the Company [or its subsidiary] . . . is voluntarily or involuntarily terminated *for any reason whatsoever*," deemed a "Call Event," "the Company shall have the right to purchase all or any portion of the Shares then held by the Purchaser." (Italics added).  A plain and ordinary reading of this provision indicates that when the employment relationship has ended—regardless of the reason— Avago may exercise its right to repurchase shares that had been previously acquired by the terminated employee.

Other provisions of the contract are in accordance.  Under section 19, the shareholders agreement expressly disavows any guaranty of continuing employment.  It reads:  "Nothing contained in this Agreement (i) obligates the Company or any Subsidiary or Affiliate of the Company to employ the Purchaser in any capacity whatsoever or (ii) prohibits or restricts the Company (or any of its Subsidiaries or Affiliates) from terminating the employment, if any, of the Purchaser *at any time or for any reason whatsoever, with or without Cause*, and the Purchaser hereby acknowledges and agrees that except as may be contained in Purchaser's employment agreement with the Company, neither the Company nor any other Person has made any representations or promises whatsoever to the Purchaser

8

concerning the Purchaser's employment or continued employment by the Company." (Italics added).

Read together, these provisions make clear that a purchaser of company shares does not acquire any additional rights or protections in his or her employment. The shareholders agreement makes no promises of continuing employment nor limits the company's ability to terminate a person's employment "for any reason whatsoever," "with or without cause," or on a "voluntary" or "involuntary basis." The contract expressly contemplates that an employee may be terminated "for any reason whatsoever," and should that occur within the applicable five-year window, Avago is entitled to repurchase its shares from the former employee. This plain and unambiguous language admits of but one clear meaning—that a reviewing court must inquire only into the *status* of a person's employment with the company (or its subsidiary), not the reasons behind the dismissal.

The context in which the shareholders agreement operates supports our analysis as well. While an employment relationship may be governed by many factors, including the terms and conditions of employment and a host jurisdiction's employment laws, the shareholders agreement is a single contract that governs the operation of an employee stock option plan across multiple countries. Its choice of law provision favoring Singapore law would be undermined were we to conclude that the repurchase provision is subject to varying interpretations based upon the differing employment laws of the host jurisdictions. What may be deemed an unlawful termination in Malaysia may be lawful in Singapore or the United States. We find no evidence that the contracting parties intended to incorporate the employment laws of host jurisdictions into the repurchase provision's terminated "for any reason whatsoever" requirement. As the Ninth Circuit concluded in *Falotti*,

9

"[t]his result would severely hamper an employer's ability to maintain uniform stock-option plans for employees residing in different jurisdictions around the world." (*Falotti*, *supra*, 319 F.3d at p. 1111.)[3]

To avoid this uncertainty and to promote the uniform application of the shareholders agreement, section 6(a)(i) creates a brightline rule in which the repurchase of company shares depends upon one factor only:  the status of a person's employment with the company.  If a purchaser is no longer actively employed with the company within the applicable period, Avago may exercise its right of repurchase.  We do not doubt that such a brightline rule may result in unfair outcomes when a person has been improperly dismissed.  But we are not at liberty to rewrite the terms of an agreement when it evinces a clear intention by the parties to condition the retention of an equitable interest in the parent company on a purchaser's continuing employment with the company.[4]

---

[3] Saw contends that the trial court improperly relied on *Falotti* because the federal court was applying the substantive law of California.   We disagree.  The trial court clearly understood it was required to apply Singapore law and found *Falotti* to be a helpful roadmap for analyzing cases involving stock option contracts and conflict of laws.  The plaintiff in *Falotti* alleged he was unlawfully terminated under Swiss law and thus the cancellation of his options was in breach of the option contract. (*Falotti*, *supra*, 319 F.3d at p. 1109.)  The Ninth Circuit held that because the option agreement provided that an employee's options would cease to vest when the employment relationship ended, it was irrelevant whether the plaintiff was lawfully or unlawfully terminated under Swiss law. (*Id.* at p. 1111.)  As we note above, Singapore law requires us to consider the commercial context of an agreement.  *Falotti's* analysis of a global stock option contract and its interaction with local employment laws offers helpful context for analyzing the shareholders agreement at issue here.

[4] At oral argument, appellant's counsel maintained that a strict interpretation of the shareholders agreement could allow a company to terminate an employee based upon a bad faith or discriminatory reason and

10

## C. Relevant Legal Precedent

Although no Singapore decision appears to address the precise issues presented in this appeal, we find the English case *Micklefield v. SAC Technology Ltd.* (Eng. 1991) 1 All ER 275 (*Micklefield*) instructive. Like Saw, the plaintiff in *Micklefield* had an employment contract with a subsidiary and a separate share option agreement with his employer's parent company. His employment contract provided that either party could end the employment relationship after providing six months' notice. (*Id.* at p. 276.) The share option agreement was subject to cancellation "[i]f any Option Holder ceases to be an Executive *for any reason*." (*Id.* at p. 277, italics added.) Shortly after notifying his employer that he intended to exercise his options, he was terminated and paid six months' salary in lieu of notice. (*Id.* at p. 278.) The parent company concluded that his options could no longer be exercised because of his dismissal. (*Ibid.*) The plaintiff sued his employer for damages caused by his wrongful termination, including the loss of his share options.

Assuming that the plaintiff had been wrongfully dismissed, the *Micklefield* court nevertheless held that the plaintiff was not entitled to recover under the option agreement. Two points are of particular relevance. First, the *Micklefield* court concluded that the wrongful dismissal of an

---

then profit from its own wrongdoing by stripping the employee of vested equity compensation. As respondent's counsel acknowledged, however, even if breach of contract may not lie under the shareholders agreement, a wrongful termination action might permit the recovery of damages for the wrongful deprivation of the employee's equitable interest. Here, Saw did in fact seek to recover the lost value of his equitable interest in his wrongful dismissal action in Malaysia, and the High Court of Malaysia remanded the matter to the Industrial Court for a determination of damages, including an evaluation of Saw's entitlement to stock options. Saw was therefore given an opportunity to raise the stock option issue before the Malaysian courts in the context of his wrongful dismissal.

11

employee spells the end of the master-servant relationship when the employee no longer performs services for his employer.  (*Micklefield*, *supra*, 1 All ER at p. 279.)  While the contractual relationship may have given rise to a claim for damages, the employment relationship has been severed.  " 'It is clear beyond argument that a wrongfully dismissed employee cannot sue for his salary or wages as such, but only for damages.  It is also, in my view, equally clear that such an employee cannot assert that he still retains his employment under the contract.' " (*Ibid.*)  The plaintiff in *Micklefield* thus "ceased to be employed when he was wrongfully dismissed . . .  even if some other aspect of his contract continued in force." (*Ibid.*)  As the trial court below aptly observed, *Micklefield* teaches that "in considering whether the employment relationship was actually terminated, the general focus should be on when the employee stopped rendering services to the employer."

Second, the *Micklefield* court addressed the plaintiff's contention that a company should not be permitted to profit from its own wrong.  While noting that other authorities have applied this principle, including *Alghussein Establishment v. Eton College* (Eng. 1991) 1 All ER 267, upon which appellant Saw also relies, the court concluded it was inapplicable to the circumstances at bar.  The exemption clause of the share option agreement was "clear and decisive" and "expressly applies if an option holder ceases to be an executive *for any reason*.  That, on its terms, includes the case of his being wrongly dismissed." (*Micklefield*, *supra*, 1 All ER at p. 281.)  In the court's view, the share option agreement "does not purport to entitle the company to take a benefit from its wrong in the relevant sense" but rather to "exempt the company from part of the damages that it would otherwise have to pay for wrongful dismissal." (*Id.* at p. 280.)

12

*Micklefield* supports the conclusion that even if Saw had been unlawfully dismissed under Malaysian law, he cannot recover under the shareholders agreement because his employment ended when he ceased rendering services for Avago Malaysia on June 1, 2009. The repurchase provision contains clear and decisive language that grants Avago the right to repurchase a former employee's shares even when dismissal is improper. Saw may be entitled to recover other damages for his wrongful dismissal, but the end of his employment cut off his right to retain shares of Avago stock under the contract.

Saw contends that *Micklefield* is inapposite because the plaintiff expressly waived his right to seek damages for the loss of his options in the event he could no longer serve as an executive. While it is true that no such waiver appears in the shareholders agreement, the absence of a waiver is not dispositive. We must give particular importance to the language chosen by the parties to express their intentions. (*Transocean Drilling*, *supra*, EWCA (Civ) 372, par. 14.) Contractual language that describes a dismissal "for any reason whatsoever," "with or without cause," or on a "voluntary" or "involuntary basis" makes it abundantly clear that no promises were made as to the option purchaser's continuing employment, and the parties clearly intended to allow repurchase of a former employee's shares when the employment relationship had ended, regardless of the reason for termination.

Saw also argues that *Micklefield* is not reliable authority because it does not purport to interpret Singapore law and a Singapore decision, *Ahlmark*, found the same contractual phrase "terminated for any reason whatsoever" unenforceable. *Ahlmark* concerned the enforceability of a liquidated damages clause in an employment contract between an airline and a pilot. The pilot was terminated after he became intoxicated and unruly as

13

a passenger on a Singapore Airlines flight. (*Ahlmark*, *supra*, 3 SLR(R) at p. 641.) He was terminated not for cause but under a provision allowing either party to end the employment relationship by paying three months' salary in lieu of notice. (*Id.* at pp. 639, 641.) Under a training agreement with the airline, a pilot trainee who "is dismissed or has his services terminated *for any reason whatsoever*" could be made liable for liquidated damages to recoup the cost of training. (*Id.* at p. 641, italics added.) After the pilot was terminated, the airline sought to enforce the liquidated damages provision against him, which would have required the pilot to pay his employer $100,000 after being fired. (*Ibid.*) The *Ahlmark* court concluded that the liquidated damages clause was so uncertain as to be "incapable of being given any contractual effect" (*id.* at p. 645), finding it would be "utterly absurd" to allow an employer to terminate trainees without cause and then charge them for the cost of their training. (*Id.* at p. 644.)

Contrary to Saw's argument on appeal, we do not find *Ahlmark* to be "precisely on point." While the option agreement at issue here shares the same verbiage "terminated for any reason whatsoever," the *Ahlmark* court did not categorically hold that such a clause can never be enforced. Rather, the court concluded that to give the clause a literal meaning under those circumstances would lead to an absurd result—that even in a dismissal without cause, the employer could sue for liquidated damages upon separation. (*Ahlmark, supra*, 3 SLR(R) at p. 645.) In contrast, the shareholders agreement here does not concern a punitive liquidated damages clause, and rather than being financially penalized by the exercise of the repurchase provision, Saw was paid fair market value for his shares and earned a profit of $400,000. Nothing in *Ahlmark* suggests termination without cause in and of itself is unconscionable under the laws of Singapore.

14

Saw also maintains that his termination was not a "call event" because his dismissal was neither "voluntary" nor "involuntary" within the meaning of the shareholders agreement. Citing to another English case, *Levett v. Biotrace International Plc* (Eng. 1999) ICR 818 (*Levett*), he claims an "involuntary" termination cannot include an "illegal" termination because employers are not permitted to profit from their wrongful acts.

Unlike the present case, *Levett* did not involve separate contracts by a parent and a subsidiary company. In *Levett*, "there was privity of contract between the plaintiff and Biotrace under his service contract and under the share option rules which were part of his renumeration package." (*Levett*, *supra*, 1999 ICR at p. 824.) The plaintiff had been employed as the company's managing director. He was terminated by the company's board of directors three years later. (*Id.* at p. 820.) The parties' employment contract provided that if the plaintiff became " 'subject to the company's disciplinary procedures, his options shall be suspended, and if such option holder's contract of employment with the company is consequently terminated' " in conformity with the agreement, then his options would immediately lapse. (*Id.* at p. 821.) On the other hand, if his employment were terminated for nondisciplinary reasons, he could continue to exercise his options "for the duration of the option period." Thus, the plaintiff's right to retain equity in the company depended upon whether he was terminated for disciplinary reasons.

After the plaintiff brought suit for wrongful termination, Biotrace conceded that it had breached the employment agreement by failing to provide him with payment in lieu of notice. Despite this breach, the company asserted that the plaintiff's options had lapsed because he had been dismissed for cause. (*Levett*, *supra*, 1999 ICR at p. 823.) In rejecting the

15

company's argument, the *Levett* court pointed out that the company had failed to invoke the disciplinary provisions prior to his dismissal. (*Id.* at pp. 823–824.) The court found that the company could not rely on the breach of its own employment contract to divest the plaintiff of his options. (*Id.* at p. 824.) *Levett* does not support Saw's argument that " 'involuntary' does not mean and does not include terminations accomplished by an unlawful act by Avago." The court simply interpreted the express terms of the agreement and concluded that the plaintiff's options could not have lapsed if the company had not undertaken the disciplinary process prior to his dismissal. *Levett* is also distinguishable because unlike this case, the plaintiff's right to equity depended upon whether his dismissal was with or without cause. Here, the option agreement spells out that Avago shares may be repurchased when an employee is dismissed "for any reason whatsoever." As the *Levett* court had no occasion to interpret this phrase in the context of a share option agreement, we find it less applicable than *Micklefield.* We therefore conclude that Saw's breach of contract claim fails as a matter of law under the express terms of the shareholders agreement.

### D. Implied Duty of Good Faith

Saw contends that "[i]t is long settled under Singaporean law that there is an implied term in all contracts that the parties must act lawfully vis-à-vis their contractual obligations." To the contrary, a general implied duty of good faith in the performance of contracts "does not, at present, exist in Singapore law." (*Max-Sun Trading Ltd v. Tang Mun Kit* (Sing. 2016) 5 SLR 815, 835.) Sidestepping this holding, Saw refers us to *The Wellness Group Pte Ltd v. OSIM International Ltd.* (Sing. 2016) 3 SLR 729 for the proposition that a duty to "act lawfully" is implied in fact in every contract. However, in *Wellness,* the court addressed a doctrine of Singapore law that

16

would allow the court to imply a contractual term if it found both that the term was necessary to give the contract full effect and that the term was so obvious that the parties would have agreed to it at the time the contract was formed. (*Id.* at p. 760.) The term considered by the *Wellness* court did not involve the duty of good faith, but rather the composition of the board of directors. The case is not on point.

Saw posits that if a term requiring lawful performance is not implied, every stock option agreement "is rendered potentially valueless, and its 'beneficiary' is left without remedy." Under the law of Singapore, however, "*inherent* in any attempt to imply a term into a contract . . . is that the court will *not rewrite* the contract for the parties based on its own sense of the justice of the case." (*Ng Giap Hon v. Westcomb Securities Pte Ltd* (Sing. 2009) 3 SLR(R) 518, 563.) Singapore courts "will *not* interfere with the *freedom* of any contracting party, except in the most exceptional circumstances." (*Ibid.*) No exceptional circumstance compels us to imply an obligation that runs counter to the express terms of the shareholders agreement. Saw was presumably aware of its conditions when he accepted the offer to purchase shares and options of Avago stock. The contract made it clear that retention of his equity was contingent on his continued employment with Avago Malaysia. Saw was compensated for his shares at fair market value and in the manner provided for by the shareholders agreement, receiving a profit of $400,000. And as we discuss below, Saw was not left without a remedy for his improper dismissal. We conclude Saw has no viable cause of action under an implied duty of good faith.

## III. *Whether Saw's Termination Was Void* Ab Initio

As we explained, whether Saw was lawfully or unlawfully terminated from his employment under Malaysian law has no bearing on whether Avago

17

breached the shareholders agreement because the repurchase provision depends upon the *status* of a person's employment with the company, not the reasons for the dismissal. However, even if we agreed that Malaysian law must be consulted to interpret the terms of the shareholders agreement, Saw has misconstrued the holding of the High Court of Malaysia.

Saw was laid off when Avago Malaysia eliminated his position as part of a business reorganization during an economic downturn. When the High Court of Malaysia reversed the Industrial Court's 2015 ruling, the court concluded that the decision to dismiss Saw was unjustified because Avago Malaysia's decline in revenue had been limited to a single quarter in 2009 and Saw's job functions were not eliminated but rather absorbed by other employees, including a newly hired vice president. The High Court thus held that the decision to dismiss Saw constituted an unfair labor practice in violation of Malaysian employment law.

Saw's principal contention on appeal is that, as a matter of Malaysian law, he "was still employed" by Avago Malaysia when his equity shares were improperly liquidated by Avago. He asserts: "There is a judicial holding here, not a mere allegation as described in Avago's motion, that Saw's termination was unlawful and therefore void *ab initio*. Consistent with both Malaysian and Singaporean law, when a dismissal is found to be illegal, as it was here, it is as though there was no termination at all." For this proposition, Saw cites only to Malaysian cases. Neither those authorities nor the ruling by the Malaysian High Court support his position.

It is true that under certain circumstances, Malaysian law allows for a wrongfully terminated employee to be reinstated to his former position with back pay, essentially voiding a wrongful dismissal. In *Mohd bin Ahmad v. Yang Di Pertua Majlis Daerah Jempol, Negeri Sembilan & Anor* (Malay.

18

1997) 2 MLJ 361, the Malaysian Federal Court explained that "[a] clear distinction has to be made between a declaration that a dismissal is invalid and void on the one hand and on the other hand, a declaration that the dismissal is wrongful. The first-mentioned declaration may be granted by the court with what in effect is a reinstatement, ie that he continues in the employ, etc. The second-mentioned declaration is invariably granted with an order for damages only by virtue of the said principle [against ordering specific performance in a personal services contract]." (*Id.* at p. 362.) "When a dismissal is merely wrongful, . . . a plaintiff is left only with a remedy in damages by virtue of the principle. When a dismissal is void, or invalid, the dismissal that took place earlier never [was] in effect, effectively [never] took place because it is void, so the old job continues." (*Id.* at p. 371.)

It is not the case, however, that all wrongful terminations are deemed void under Malaysian law, particularly when the remedy is confined to damages. (See *Holiday Inn Hotel, Penang v. National Union of Hotel, Bar and Restaurant Workers* (Malay. 1987) ILR 264, par. 13 [concluding that while reinstatement "is the normal relief" for wrongful or illegal discharge, a "[p]ragmatic approach" permits the award of damages when reinstatement "is not proper or expedient"]; *Thilagavathy Alagan Muthiah v. Meng Sing Glass Sdn Bhd & Anor* (Malay. 1997) 4 CLJ Supp., par. 2 ["[c]ircumstances in a given case may not move the court to order reinstatement even though a workman was dismissed without just [cause] and excuse. By virtue of s. 30 of the [Industrial Relations Act 1967] . . . the Industrial Court could instead make an order of compensation in lieu."].)

In Saw's case, the judicial commissioner of the Malaysian High Court did not find reinstatement to be the appropriate remedy. Contrary to Saw's contentions on appeal, the commissioner did not hold that Saw's termination

19

was "void *ab initio*." Rather, after concluding that the Industrial Court erred in finding Saw's termination to be justified, the commissioner remitted the matter to that court "for assessment of compensation and back wages and other benefits and emoluments, if any." In other words, the court concluded that Saw's available remedy for wrongful dismissal was an award of damages to compensate him for the loss of his employment. This conclusion is borne out by the transcript of the High Court hearing, in which the following exchange occurred:

> **[Commissioner]:** "So I remit the case back to the Industrial Court for assessment of compensation, back wages and other benefits and emoluments, if any. So that's the order I make."
>
> **[Saw's attorney]:** "That is in lieu of reinstatement."
>
> **[Commissioner]:** "Yes. In lieu of reinstatement."
>
> **[Saw's attorney]:** "Because the Applicant is now at the age of 62."
>
> **[Commissioner]:** "So the order is I remit the case back to the Industrial Court for assessment of compensation and back wages and other benefits and emoluments, in lieu of reinstatement as the Applicant is the age of 62. I think the relationship has also broken down to the extent that I don't think it's conducive. Alright. So that would be the order."[5]

Accordingly, Saw was not reinstated to his former position of employment by the courts of Malaysia, and Malaysian law did not recognize him to be an employee of Avago Malaysia when Avago issued the call notices for his shares in equity. Because there is no dispute that Saw ceased rendering services for his employer upon his dismissal on June 1, 2009, the

---

[5] Moreover, Saw concedes that Malaysian law does not permit a 62-year-old former employee to be reinstated under any circumstances.

20

dismissal spelled the end of his employment relationship and cut off his right to retain shares of Avago stock under the shareholders agreement.

## IV. *Whether Quasi Contract Relief Is Available*

Finally, we conclude that Saw's claim for unjust enrichment as an alternative cause of action is not viable under Singapore law. "[O]rdinarily restitutionary principles are supplemental to the law of contract where the parties are in a contractual relationship [citations]. The rationale behind this general rule is that the law of restitution should not redistribute the risks which the parties have, by contract, already allocated." (*Max Media FZ LLC v. Nimbus Media Pte Ltd* (Sing. 2010) 2 SLR 677, 688.) One recognized exception is where the consideration for the contract has totally failed, and, even then, only if there is no express or implied term in the contract making a payment irrecoverable. (*Id.* at p. 689.) That is plainly not the case here, as Saw was compensated for his equity in the manner provided for under the shareholders agreement.

Rather than cite to Singapore law, Saw relies on *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 389 for the proposition that "restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason." California law does not apply to this agreement. In any event, as we have discussed at length, the shareholders agreement is not unenforceable or ineffective, and Saw does not argue that it was procured by fraud.

## DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

21

_____
Sanchez, J.

WE CONCUR:


_____
Humes, P. J.


_____
Margulies, J.


*A153824  Saw v. Avago Technologies Limited*

Trial Court:        San Mateo County Superior Court

Trial Judge:        Hon. Susan L. Greenberg

Counsel:

The Law Offices of Thomas V. Christopher, Thomas V. Christopher, for Plaintiff and Appellant

O'Melveny & Meyers, Eric J. Amdursky, Ramon Ramirez, Ryan Rutledge, for Defendant and Respondent

*A153824  Saw v. Avago Technologies Limited*